**LOCAL UNION NO. 5741, UNITED MINE WORKERS OF AMERICA,** Petitioner, Cross–Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent, Cross–Petitioner.

Nos. 87–5962, 6167.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 11, 1988.

Decided Jan. 10, 1989.
Rehearing and Rehearing En Banc Denied March 29, 1989.

James R. Hampton (argued), Hazard, Ky., for petitioner, cross-respondent.

Aileen Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Aileen A. Armstrong, Peter Winkler, Karen Cordry (argued), Washington, D.C., for respondent, cross-petitioner.

Before KEITH and NELSON, Circuit Judges, and DUGGAN, District Judge.[*]

DAVID A. NELSON, Circuit Judge.

The question for decision in this case is whether the National Labor Relations Board erred in holding that the petitioning United Mine Workers local union is the "successor," for labor law purposes, of another UMW local, now defunct, that had an unsatisfied monetary obligation as a result of having committed an unfair labor practice. Petitioner seeks review of a Board order making it responsible for the other local's debt, and the Board cross-petitions for enforcement. For the reasons stated below, we shall grant the Board's cross-petition for enforcement.

I

The defunct union, Local Union No. 9639 of the United Mine Workers of America, committed an unfair labor practice by causing the discharge of a non-union miner. The NLRB ordered the local to pay the miner his lost earnings. It was stipulated that the amount of Local 9639's liability came to $12,327.65, plus interest.

On August 19, 1982, this court granted enforcement of the NLRB order. About two weeks later Local 9639 filed a petition under Chapter 7 of the Bankruptcy Code, 11 U.S.C. §§ 701 *et seq.*, expecting to obtain a discharge of its debt to the miner. The Board filed a proof of claim on the miner's behalf, and he was awarded all of Local 9639's monetary assets, about $2100.

---

[*] The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

Local 9639 asked the bankruptcy court for authority to continue to operate, but on September 27, 1982, after learning that the unpaid balance of its debt was not dischargeable, the local withdrew the motion and simply ceased to function. The local ultimately surrendered its charter to the UMW.

Between October 21 and November 9, 1982, every one of the approximately 55 working members of Local 9639 transferred his membership to Local 5741. The latter local had theretofore had approximately 132 active and 356 inactive members. By November 23 approximately 190 of 243 idle or retired members of Local 9639 had also transferred to Local 5741. These transfers resulted from "bathhouse talk" in which individual members of Local 9639 discussed the proximity of Local 5741 to themselves and the mines in which they worked. Nineteen retired members of Local 9639 eventually transferred to other UMW locals.

At the time of the transfers into Local 5741, that local's president knew that the defunct local had been found guilty of an unfair labor practice and had been ordered to pay the discharged miner his lost wages. Local 5741 also knew, through its president, that Local 9639 had ceased to function as a result of the Board-imposed liability. No money or property of Local 9639 was transferred to Local 5741.

Under the constitution of the UMW, no transfer fees were payable by the members of Local 9639. Neither did the transferees have to execute new dues deduction authorization cards on behalf of Local 5741. The employer continued to remit dues to District 30 of the UMW for the Local 9639 members, just as it had done in the past. These remittances were designated for Local 9639 until at least December of 1982, when the secretary-treasurer of District 30 requested that the name of Local 5741 be used. Dues remitted for the defunct local were never returned by District 30. Instead, District 30 kept one-third for itself, remitted one-third to the UMW, and remitted the remainder to Local 5741.

Once the members of Local 9639 had transferred to Local 5741, that local began to act as their collective bargaining representative. Although no officers of Local 9639 became officers of Local 5741, the president of Local 5741 immediately reappointed eight transferees to their old positions on mine and safety committees. It is undisputed that Local 5741 took over representation of Local 9639's former members without any hiatus and that Local 5741 administered on their behalf the same collective bargaining agreement previously administered by Local 9639. Grievances of Local 9639 members arising prior to the transfer were processed by Local 5741.

On December 4, 1985, a regional director of the NLRB ordered that a supplemental hearing be held to determine whether Local 5741 was jointly and severally liable with Local 9639 for the balance of the back pay due the discharged non-union miner. The hearing resulted in a finding that Local 5741 was the successor to Local 9639 for purposes of Local 9639's unsatisfied back-pay obligation, and that finding was ultimately adopted by the Board. The Board's findings of fact are conclusive if supported by substantial evidence, 29 U.S.C. § 160(e), and the foregoing facts, which we have adopted from the Board's decisions, are supported by substantial evidence.

## II

Congress gave the NLRB authority to determine the remedies for labor organizations' unfair labor practices, to the end that a uniform national policy might be developed and enforced. *Garner v. Teamsters*, 373 Pa. 19, 94 A.2d 893, *aff'd*, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953). It is the Board's task to devise remedies that effectuate the policies of the Act, *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 215–16, 85 S.Ct. 398, 405–06, 13 L.Ed.2d 233 (1964), and a reviewing court must give special respect to the remedies chosen by the Board. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969). A remedial order will not be disturbed unless it represents a patent attempt to achieve ends contrary to the Act.

*Virginia Elec. & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943); *J.P. Stevens & Co. v. NLRB,* 623 F.2d 322, 327 (4th Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed. 2d 800 (1981).

Permitting a disappearing employer's unfair labor practices to go unremedied contributes to labor unrest, particularly where there is continuity in the employing industry; where there is substantial continuity between enterprises, a successor's failure to remedy its predecessor's unfair labor practices may appear to employees to be a continuation of the predecessor's labor policies. *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 184, 94 S.Ct. 414, 425, 38 L.Ed.2d 388 (1973). Similar considerations would seem to apply, *mutatis mutandis,* where a disappearing local union has committed an unfair labor practice, and there is substantial continuity between that local and one that continues to operate.

▮ The Board's remedial powers under § 10(c) of the Act include the power to order a bona fide successor employer who has not committed an unfair labor practice to reinstate and provide back pay to an employee wrongfully discharged by the predecessor employer. *Golden State Bottling Co.,* 414 U.S. at 175–77, 94 S.Ct. at 420–22. The decision whether to impose such liability involves striking a balance between the conflicting interests of the innocent successor, the public, and the victimized employee, *id.* at 181, 94 S.Ct. at 423, and the Board is uniquely qualified to make that kind of judgment. The Board is no less qualified to make the similar judgment called for by the facts of this case.

### III

▮ The test of successorship, in the employer situation, is whether there is "substantial continuity" between the enterprises. *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 44, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987). The successorship question is primarily factual in nature and involves consideration of a number of factors:

"Whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisor; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers."

*Id.* Such indicia of continuity are all to be fed into the "substantial continuity" calculus, and the presence or absence of a single factor is not determinative. All the circumstances must be evaluated, with particular attention being paid to whether employees who have been retained will view their job situations as substantially unaltered. *Id.* 107 S.Ct. at 2236–37. The labor law doctrine of successorship is a broad one, and as long as there is continuity in the "employing industry," the public policies of the doctrine will be served by its broad application. *Golden State Bottling Co.,* 414 U.S. at 182 n. 5, 94 S.Ct. at 424 n. 5.

The NLRB first applied its successor liability doctrine to labor organizations, as opposed to employers, in *Local Union No. 46, Metallic Lathers (Cement League),* 259 N.L.R.B. 70 (1981), *enforcement denied in pertinent part,* 727 F.2d 234, 237–38 (2d Cir.1984). In *Cement League* the NLRB concluded that the United Brotherhood of Carpenters, as the successor to the International Lathers, should be responsible for remedying unfair labor practices of the Lathers. 259 N.L.R.B. at 70. The Board noted that the victims of unfair labor practices in a union affiliation context are just as needful of a meaningful remedy as are unfair labor practice victims caught by the transfer of an employing business.

The Court of Appeals for the Second Circuit refused to enforce the imposition of liability upon the Carpenters Union in *Cement League.* It did so not because it disagreed with the Board's conclusion that the latter union was the Lathers' successor, or because it considered the successor doctrine inapplicable to unions, but because it found that the Carpenters had no knowledge of the unfair labor practices at the time of the succession. See *Local Union No. 46,* 727 F.2d at 237–38. In the case at bar, by contrast, it is undisputed that Local 5741 knew of the unfair labor practice when the members of Local 9639 transferred into Local 5741.

■ A special master of the United States District Court for the Southern District of New York recently offered the following list of factors relevant to a finding of union successorship:

"1) whether the successor union had notice of the liability;

2) the ability of the predecessor union to provide relief;

3) whether there has been a substantial continuity of the union's operations;

4) whether the successor union uses the same offices or encompasses the same jurisdiction;

5) whether the successor union has absorbed the predecessor's membership;

6) whether the officers of the predecessor union continued in some official capacity in the successor union;

7) whether the wages, terms and conditions of employment administered by the predecessor, as set forth in the collective bargaining agreement, are the same or substantially equivalent to those administered by the successor;

8) whether the members continue to pay dues and enjoy the same membership rights; and

9) whether the members continue to work at the same trade for the same or similar employers."

*EEOC v. Local 638, Sheet Metal Workers' Int'l Ass'n.*, 46 Emp.Prac.Dec. (CCH) ¶ 37,846 at 51,322 (S.D.N.Y.1988) [1988 WL 25151] see also *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1094 (6th Cir.1974).

■ Reviewing the foregoing list in light of the situation presented in the case at bar, we cannot say that the NLRB erred in holding Local 5741 liable as a successor. The indicia of continuity between Local 9639 and Local 5741 are more numerous and more substantial than the indicia of discontinuity.

The 55 active employees who transferred to Local 5741 continued to work in the same mines without interruption or dislocation. The mine and safety committees remained in place with the same members. Dues continued to be checked off and remitted to District 30 of the UMWA without interruption. Grievances filed before the dissolution of Local 9639 were processed by Local 5741, and District 30 continued to be substantially involved in the grievance process, just as it had been before. Local 5741 took over representation of Local 9639's former members without any hiatus and administered the same contract previously administered by Local 9639. From the perspective of the employee who had been victimized by Local 5741, nothing in the employing industry had changed—and the need for remedying the unfair labor practice had not dissipated.

■ We think it is probably true, as Local 5741 contends, that it did not become Local 9639's successor voluntarily. The Landrum–Griffin Act guarantees equal rights to all persons who have fulfilled union membership requirements, 29 U.S.C. §§ 402(*o*), 411(a)(1); see also *Alvey v. General Elec. Co.*, 622 F.2d 1279, 1284 (7th Cir.1980) (as modified on denial of rehearing and rehearing en banc September 16, 1980) and *Parish v. Legion*, 450 F.2d 821, 824–26 (9th Cir.1971). The Landrum–Griffin Act does not prevent unions from reserving discretionary power to refuse membership, *Gavin v. Structural Iron Workers Local No. 1*, 553 F.2d 28, 30–31 (7th Cir.1977), but where no such power has been reserved, applicants who meet the requirements cannot lawfully be denied membership. *Woods v. Local Union No. 613, Int'l Bhd. of Elec. Workers*, 404 F.Supp. 110, 116–18 (N.D.Ga.1975). Because the former members of Local 9639 had fulfilled all of the requirements for membership in Local 5741, it is doubtful that Local 5741 could have excluded the transferees from membership or could have refused to represent them. See *NLRB v. Retail Clerks Union Local 1179*, 526 F.2d 142, 145–47 (9th Cir.1975) (attempt to discipline union members by refusing to transfer their membership to another local union is contrary to national labor policy and therefore violative of NLRA); *NLRB v. Plumbers & Steam Fitters Local Union No. 100*, 491 F.2d 1104 (5th Cir.1974) (refusing to accept members of sister locals in contravention of international's constitution was violation of NLRA); *NLRB v.*

*Katz,* 622 F.2d 242 (6th Cir.1980) (change of local affiliation by employees does not affect employer's obligation to recognize and bargain with union); *NLRB v. Coca-Cola Bottling Co.,* 616 F.2d 949 (6th Cir.) (employer commits unfair labor practice by withdrawing recognition after union local switches affiliation from one international to another), *cert. denied,* 449 U.S. 998, 101 S.Ct. 540, 66 L.Ed.2d 297 (1980).

If Local 5741 became a successor involuntarily, its knowledge of the unremedied unfair labor practice of its predecessor may be less significant than it would be otherwise. This does not mean, however, that the Board could not properly find that an imposition of liability would be equitable on the facts of this case—and it is the balancing of the equities that legitimates the Board's decision to impose liability on a successor. *Perma Vinyl Corp.,* 164 N.L.R.B. 968, 969 (1967), *enforced in part sub nom. United States Pipe & Foundry Co. v. NLRB,* 398 F.2d 544 (5th Cir.1968). As the Supreme Court has said, "the *Perma Vinyl* line of cases has involved striking a balance between the conflicting legitimate interests of the bona fide successor, the public, and the affected employee." *Golden State Bottling Co.,* 414 U.S. at 181, 94 S.Ct. at 423.

In the case at hand, to repeat, there has been no real change in the employing industry insofar as the victim of the unfair labor practice is concerned. The need for remedying the unfair labor practice remains undiminished. The predecessor union no longer exists, and it is Local 5741 that is in the best position to provide a remedy. Requiring it to do so serves the public's interest in seeing that the policies of the Act are carried out.

Although Local 5741 may not have chosen to become the defunct local's successor, Local 5741 did succeed to ,the dues obligations of the former members of Local 9639. As the administrative law judge correctly noted, dues payments of union members are the "economic lifeblood of a labor organization and normally its primary source of income." If these dues were not assets of Local 9639, strictly speaking, the transfer of this source of revenue is at least analogous to a transfer of income-pro-ducing assets from a predecessor employer to a successor employer.

The judgment call that the NLRB had to make in this case was not an easy one, but that should make us all the more reluctant to overturn it. Here, as in similar cases, the courts "cannot say that the Board has erred in thus 'striking [the] balance to effectuate national labor policy....'" *Golden State Bottling Co.,* 414 U.S. at 187, 94 S.Ct. at 426 (quoting *NLRB v. Teamsters Local 449,* 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957)).

The petition for review is DENIED, and the cross-petition for enforcement is GRANTED.

DUGGAN, District Judge, dissenting.

I respectfully dissent.

The majority opinion discusses many of the factors to be considered in determining whether successor liability should be imposed. It does not, however, place appropriate significance on the fact that Local 5741 did not *voluntarily* choose to become the successor to Local 9639. The majority opinion acknowledges that it is "probably true" that Local 5741 did not become the successor voluntarily. In fact, the NLRB admitted that Local 5741 "... was obligated to accept valid transferees as members." (NLRB brief, p. 4.) This factor, in my opinion, distinguishes this case from those relied upon by the majority and by the NLRB.

Implicit in the Supreme Court's decision in *Golden State Bottling Co. v. N.L.R.B.,* 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973) is the fact that the successor chose to become the successor. The same is true in the *Perma Vinyl* decision (*Perma Vinyl Corp.,* 164 N.L.R.B., 968 (1967)), which the Supreme Court cited with approval in *Golden State.* The Supreme Court, quoting *Perma Vinyl Corp.,* stated:

The imposition of this responsibility upon even the bona fide purchaser does not work an unfair hardship on him. *When he substituted himself* in place of the perpetrator of the unfair labor practices, he became the beneficiary of the unremedied unfair labor practices. Also his potential liability for remedying the unfair

labor practices is a matter which can be reflected in the price he pays for the business, or he may secure an indemnity clause in the sales contract which will indemnify him for liability arising from the seller's unfair labor practice.

*Golden State* at 172, n. 2, 94 S.Ct. at 419, n. 2 (emphasis added). The courts' tacit assumption, in the *Golden State* and *Perma Vinyl* opinions, is that the application of successor liability is inequitable unless the successor voluntarily agreed to assume the position of its predecessor, including the predecessor's liabilities.

The majority states that the NLRB first applied its successor liability doctrine to labor organizations in *Local Union No. 46, Metallic Lathers (Cement League)* 259 NLRB 70, (1981). Yet on appeal, the Second Circuit, while specifically declining to reach the "troublesome question whether there was a 'substantial continuity of identity'" between the predecessor and successor, refused to impose successor liability on the Carpenter's Union because it found that the Carpenter's Union had no knowledge of the unfair labor practices charges pending against its predecessor at the time the two unions affiliated. *NLRB v. Local Union No. 46, Metallic Lathers,* 727 F.2d 234, 237–38 (2nd Cir.1984). The same principle on which the *Golden State* and *Perma Vinyl* courts relied is evident (although unexpressed) in *Local Union No. 46, Metallic Lathers;* that is, in the absence of a knowing, voluntary assumption of a predecessor's debt, a successor cannot equitably be held liable.

In sum, when a successor has no knowledge of the predecessor's liability, or when the successor has no choice but to substitute for the predecessor, as in the present case, I believe that it is unjust to burden the successor with the financial obligations of the predecessor.

Although it is undisputed in the instant case that after the transfer of members, Local 5741 began receiving a portion of each active member's dues, ranging from $11.00 per year to $14.00 per year,[1] these *future* dues presumably were to cover the cost of *future* services to be rendered to these members. Even assuming that there were no increased administrative cost in absorbing these 55 members, the annual income received from the new members would total less than $800.00. At the same time, however, Local 5741 was required to absorb a debt of the predecessor local in excess of $10,000. Because the membership of Local 5741 could not refuse to accept Local 9639's former members, the financial burden of the defunct local should not be imposed upon Local 5741. The Board's decision to impose successor liability on an entity that did not choose to become a successor is not supported by substantial evidence on the record as a whole and I believe such decision to be clearly erroneous. The Board's petition for enforcement should be denied.

---

**1.** The record also reflects that a number of idle or retired members of Local 9639 also transferred to Local 5741, but the record is silent as to what amount of dues, if any, Local 5741 collects from these members.